# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

AL-AMEEN I. MAZAHREH, et al.　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　*Plaintiffs*,　)
　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　Civil Action No. 1:20-cv-17598 -
　　　　　　　　　　　　　　　　　　)　RMB-JS
GURBIR GREWAL, et al.　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　*Defendants*.　)

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ................................................................ 3

STANDARD OF REVIEW ............................................................... 4

ARGUMENT .................................................................................... 5

I.   The conduct restricted by New Jersey's "justifiable need"
     requirement lies at the core of the Second Amendment.............................5

     a.   Text, history, precedent, and purpose all confirm that
          the right to keep and bear arms extends outside the
          home. ......................................................................................... 5

     b.   *Drake* erred in concluding that New Jersey's "justifiable
          need" requirement is longstanding and "presumptively
          lawful."..................................................................................... 15

     c.   The right to carry arms outside the home in self-defense
          is at the core of the Second Amendment.................................. 20

II.  Under *Heller*, Defendants' requirement that law-abiding
     citizens demonstrate a special need for self-defense to
     exercise their Second Amendment rights is categorically
     unconstitutional. .........................................................................................22

III. *Drake* was wrong to uphold Defendants' "justifiable
     need" restriction under intermediate scrutiny.........................................24

     a.   Strict scrutiny should apply..................................................... 24

     b.   Defendants' "justifiable need" restriction fails even
          intermediate scrutiny, properly applied. ................................. 25

IV.    Because the Court is Compelled to Dismiss the Amended
       Complaint in its Entirety Under *Drake*, the Court Should
       Dismiss Defendants' Arguments that Would Result in
       Partial Dismissal as Moot..............................................................32

V.     Defendants Tarantino, Rea, and Conforti are not entitled
       to judicial immunity.....................................................................33

VI.    Plaintiff De Almeida was not Required to Exhaust
       Administrative Remedies Because Applying for A Permit
       Would Have been Futile................................................................35

VII.   The Amended Complaint States a Claim against
       Defendant Bryan..........................................................................39

       CONCLUSION..............................................................................40

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................... 4

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)....................................... 9

*Aymette v. State*, 21 Tenn. 154 (1840).......................................................... 16

*Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266 (3d Cir. 2014)................................................................................................... 36

*Benning v. Browner*, No. CIV. A. 97-CV-7058, 1998 WL 717436 (E.D. Pa. Sept. 24, 1998) ............................................................................ 33

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)................................. 12, 16

*Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194 (3rd Cir. 2000)..................................................................................................... 33

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016)........................................ 7

*City of Los Angeles v. Alameda Books, Inc* 535 U.S. 425 (2002) ............... 26

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ................... 26

*D'Amico v. CBS Corp.*, 297 F.3d 287 (3d Cir. 2002)................................... 37

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................... passim

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ......................................... passim

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) .............................. 14

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990)................................................................................... 24

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ...................... 24

*Forrester v. White*, 484 U.S. 219 (1988)...................................................... 34

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016), ................................................................................. 25, 26, 27, 31

*Houghton v. Shafer*, 392 U.S. 639 (1968) ........................................ 3, 35, 36

*Hum. Genome Scis., Inc. v. Genentech, Inc.*, 589 F. Supp. 2d 512 (D. Del. 2008)...................................................................................... 35, 36

*In re Pries*, 573 A.2d 148 (NJ 1990) ............................................................ 3, 34

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ............... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S.
    118 (2014) ................................................................................................. 39

*Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D. Tex. 2015), *rev'd
    on other grounds sub nom. Mance v. Sessions*, 880 F.3d 183 (5th
    Cir. 2018) ................................................................................................. 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574
    (1986) ......................................................................................................... 4

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................... 31

*McDonald v. City of Chicago* 561 U.S. 742 (2010) ..................... 9, 15, 22, 25

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ......................... 39

*Metro. Life Ins. Co. v. Price*, 501 F.3d 271 (3d Cir. 2007)............................ 36

*Mireles v. Waco*, 502 U.S. 9 (1991) ................................................................ 33

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ............................ 6, 7, 8, 21

*Muscarello v. United States*, 524 U.S. 125 (1998) ......................................... 6

*Neitzke v. Williams*, 490 U.S. 319 (1989) ...................................................... 32

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ........................ 24

*Nunn v. State*, 1 Ga. 243 (1846)..................................................... 7, 8, 12, 16

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).................... 10

*Pulliam v. Allen* 466 U.S. 522 (1984) ............................................................ 33

*RD Legal Funding, LLC v. Barry A. Cohen, P.A.*, No. CIV.A. 13-77
    JLL, 2013 WL 1338309 (D.N.J. Apr. 1, 2013) ............................................ 32

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) .......................................... 9, 13

*Robinson v. Dalton*, 107 F.3d 1018 (3d Cir. 1997) ....................................... 36

*Rogers v. Grewal*, 2018 WL 2298359 (D.N.J. 2018)..................................... 32

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973).................. 25

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1
    (2000) ........................................................................................................ 35

*Shelby Cty. v. Holder*, 570 U.S. 529 (2013) ................................................. 30

*Siccardi v. State*, 59 N.J. 545 (1971)............................................................. 34

*Simpson v. State*, 13 Tenn. 356 (1833) ........................................... 13

*Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686) ........................... 12

*State v. Chandler*, 5 La. Ann. 489 (1850) ...................................... 16

*State v. Huntly*, 25 N.C. 418 (1843) ............................................. 13

*State v. Reid*, 1 Ala. 612 (1840) ....................................... 12, 16, 17

*State v. Valentine*, 124 N.J. Super. 425 (App. Div. 1973) ........................... 27

*Susquehanna Valley All. v. Three Mile Island Nuclear Reactor*, 619 F.2d 231 (3d Cir. 1980) ................................................. 38

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ................................ 29

*U.S. ex rel. Marrero v. Warden, Lewisburg Penitentiary*, 438 F.2d 656 (3d Cir. 1973), *rev'd on other grounds by Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, (1974) ........................... 38

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ............................ 5

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................. 28

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ................... 30

*Wilson v. MVM, Inc.*, 475 F.3d 166 (3d Cir. 2007) ..................... 3, 35, 37, 38

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ............ passim

## Statutes

42 U.S.C. § 1983 ...................................................................... 33

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ..................................... 14

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165 ............................... 14

N.J.S. 2C:58-4 ........................................................................ 36

## Other Authorities

1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884) ........................................... 11

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW (O. Holmes ed., 12th ed. 1873) ................................................................. 17

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804) ....................................................................... 13

4 WILLIAM BLACKSTONE, COMMENTARIES .................................................. 12

5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803) ............................................................ 10

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB ................................................................. 8

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) ................................................... 13

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) ......................................... 15

David B. Mustard, *Comment, in* EVALUATING GUN POLICY 325 (Jens Ludwig & Philip J. Cook eds., 2003) ................................. 28

*Firearms*, Monticello, https://goo.gl/W6FSpM ........................................... 11

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995) .................................................... 31

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998) ............................................. 31

*Gun Laws*, NRA-ILA, https://goo.gl/Nggx50 .............................................. 28

HARLOW GILES UNGER, LION OF LIBERTY 30 (2010) ................................... 11

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905) ....................................................... 11

*Legality of the London Military Foot-Association* (1780), reprinted in WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59, 59 (1785) ............................................................... 10

Michael J. Klarman, *Rethinking the Civil Rights & Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996) ..................................... 18

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005) ...................................................... 29

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) ............................................. 10

Philip J. Cook et al., *Gun Control After Heller*, 56 UCLA L. REV. 1041 (2009) ................................................................................. 28

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED.  40, 53–54 (2005) ......................................................................................... 29

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) ..................................................... 14

WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906) ............................................... 15

WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716) .................................................................................. 9, 12

WILLIAM LAMBARD, EIRENARCHA 135 (1588) ............................................ 12

WILLIAM M. DARLINGTON, CHRISTOPHER GISTS'S JOURNALS 85–86 (1893) ..................................................................................... 11

## Rules

Fed. R. Civ. P. 12(b)(1) ........................................................................ 36

Fed. R. Civ. P. 12(b)(6) .................................................................. 32, 36

Fed. R. Civ. P. 56(a) ............................................................................. 4

N.J.A.C. 13:54-2.4(d)(1) .................................................................. 2, 23

## Constitutional Provisions

U.S. Const. amend II ................................................................... passim

**INTRODUCTION**

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not mean to leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id*. at 634.

Defendants—state and local officials responsible for administering and enforcing New Jersey's regulations governing carrying firearms outside the home—have imposed severe limits on "the right of the people to . . . bear Arms," U.S. Const. amend. II, that flout these basic constitutional principles at every turn. New Jersey has seized the power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a license to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, has, in the estimation of its local licensing authorities, shown a sufficiently "justifiable need" to exercise that right, N.J.S. 2C:58-4(c). Worse still, the State has determined that a general desire to carry a weapon for self-defense is not a sufficiently justifiable need—demanding, instead, proof that a law-abiding citizen wishing to exercise the

1

right has an "urgent necessity for self-protection," N.J.A.C. 13:54-2.4(d)(1), more acute than a "generalized fear[ ] for personal safety," *In re Preis*, 573 A.2d 148, 152 (N.J. 1990). This is irreconcilable with the Constitution's reservation to the people themselves of the right to determine whether to carry firearms for the "core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

The Third Circuit—in precedent that is binding on this Court—has upheld the "justifiable need" requirement. *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013). But *Drake* is deeply flawed and should be overturned. It disregards the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts mere "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Drake*'s application of it—deferring to the State's judgment that its restriction advances public safety, even though New Jersey has wholly failed to support that proposition with any meaningful evidence—is not.

In sum, New Jersey's "justifiable need" restriction is unconstitutional, but this Court is presently bound by circuit precedent to uphold it.

Additionally, Defendants' assertion that Defendants Tarantino, Rea, and Conforti—three Superior Court judges tasked by state law with administering New Jersey's permitting regime—are immune from suit is wrong. As Defendants

2

concede, judicial immunity applies only where a defendant is haled into court for acting in his judicial capacity. And New Jersey law makes clear beyond doubt that in granting or denying Handgun Carry Permit applications, Superior Court Judges are undertaking "essentially an executive function" that is "clearly non-judicial in nature." *In re Pries*, 573 A.2d at 151. No judicial immunity shields Defendants Tarantino, Rea, and Conforti from suit based on these non-judicial acts.

Finally, there was no need for Plaintiff Billy De Almeida to exhaust his administrative remedies by applying for a permit before bringing this lawsuit. It would have been futile for Mr. De Almeida to apply. Futility is a well-established exception to the exhaustion rule. *Houghton v. Shafer*, 392 U.S. 639, 640 (1968); *Wilson v. MVM, Inc*., 475 F.3d 166, 174 (3d Cir. 2007).

Mr. De Almeida has pleaded that he cannot show the required "justifiable need," and therefore an application submitted by him would necessarily have had to have been denied — which is the whole point of this lawsuit. Like the other Plaintiffs, Mr. De Almeida cannot show "justifiable need" but also cannot be required to do so under the Constitution.

## STATEMENT OF FACTS

For the sake of brevity, Plaintiffs refer the Court to the accompanying Statement of Undisputed Material Facts.

3

## STANDARD OF REVIEW

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A fact is "material" if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id*. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The dispute is not "'genuine'" if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (citations omitted).

Because this Court is bound by *Drake*, as flawed and incorrect as that decision is, this Court is compelled to grant summary judgment and dismiss the Amended Complaint, leaving Plaintiffs to pursue their appellate rights to a court with the authority to overturn *Drake*.

## ARGUMENT

**I.    The conduct restricted by New Jersey's "justifiable need" requirement lies at the core of the Second Amendment.**

> **a. Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home.**

The Court, in *Heller,* held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. And although that landmark ruling did not purport to "clarify the entire field" of Second Amendment jurisprudence, *id*. at 635, it set forth clear guidance about *the methodology* for deciding future disputes over the right to keep and bear arms. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id*. at 634–35, determining if a restriction infringes on the Second Amendment requires a close inquiry into the Amendment's "text in light of its meaning at the time of ratification," *United States v. Marzzarella*, 614 F.3d 85, 90 (3d Cir. 2010). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the home for self-defense is squarely protected by the Second Amendment.

1.    The text of the Second Amendment leaves no doubt that it applies outside the home. It uses twin verbs in the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all

times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home.

2.   Confining the right to keep and bear arms to the home would also be at war with precedent. "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id*. at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id*. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). And *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise there would

6

be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively relies on *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id*. at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

The Third Circuit in *Drake* "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," choosing instead to assume for the sake of analysis that the Amendment has "some application beyond the home." 724 F.3d at 431. That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942.

3.     The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia." *Id*. at

612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)). If citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id*. at 599. Hunting cannot be done by those bearing arms only within their homes. The same reasoning applies with even more force to "the central component" of the Second Amendment right: self-defense. *Id*. There is nothing in *Heller* or the Second Amendment's text to suggest that this core purpose may only be pursued in the home. And "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id*. at 942. Indeed, according to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[1] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

---

[1] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB.

4.      Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public: "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716).

Because the right to self-defense was understood to exist beyond the home, the right to armed self-defense naturally was, too. Accordingly, by the late seventeenth century, English courts recognized the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London—a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 328 n.8 (D.C.

9

Cir. 2007)—opined that "[t]he right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable." *Legality of the London Military Foot-Association* (1780), reprinted in WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59, 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the home. They included "immediate self-defence, . . . suppression of violent and felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id*. at 63. That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws requiring arms-carrying in certain circumstances," such as when traveling or attending church. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). If the law imposed on individuals a civic duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, the law necessarily conferred on those citizens a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a[] European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made

clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id*. App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GISTS'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://goo.gl/W6FSpM. And when defending the British soldiers charged in the Boston Massacre, John Adams declared that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

11

This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g., Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, English courts read the Statute of Northampton as "prohibiting the carrying of 'dangerous and unusual weapons,' " *id*. at 627—weapons not protected by the right to keep and bear arms, *id*. at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). But this rule against "*riding* or *going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 WILLIAM BLACKSTONE, COMMENTARIESF *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136. After all,

12

even by the late seventeenth century there was "a general connivance to gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

Early American courts and commentators shared this understanding of the right to bear arms for self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

This reading of the Second Amendment persisted throughout the nineteenth century. Reconstruction Era views are "instructive" of the Second Amendment's scope because they reflect "the public understanding of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. And those who wrote and ratified the Fourteenth Amendment clearly understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States schemed to prevent their enslaved and free black populations from bearing arms at every turn. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as citizens because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Like restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And in an ordinance strikingly similar in operation to New Jersey's "justifiable need" law,

14

several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts lead to the adoption of the Fourteenth Amendment, ensuring the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

> **b. *Drake* erred in concluding that New Jersey's "justifiable need" requirement is longstanding and "presumptively lawful."**

While acknowledging "that the Second Amendment's individual right to bear arms may have some application beyond the home," the Drake court concluded that the conduct burdened by New Jersey's "justifiable need" restriction was outside the Amendment's scope, because that restriction "qualifies as a 'longstanding,' 'presumptively lawful' regulation." 724 F.3d at 431–32. Not so.

*Drake*'s principle piece of evidence for this conclusion was a series of late-nineteenth-century laws targeting "the carrying of concealed weapons," *id*. at 433. But those laws do not justify New Jersey's "justifiable need" requirement. While

they limited the carrying of concealed firearms—a practice that was considered dishonorable and especially dangerous, by the social mores of the day—they did so against the background of freely allowing the open carrying of arms in common use, "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left the right to carry firearms in *some* manner intact was absolutely *critical* to most of the courts that upheld them. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *State v. Reid*, 1 Ala. 612, 616–17 (1840). And it was also endorsed in opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also Bliss*, 12 Ky. at 91–94.[2] These laws thus provide

---

[2] A few courts from this era upheld concealed carry bans without relying on this distinction, but they did so "on the basis of an interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" *Kachalsky v. County of Westchester*, 701 F.3d 81, 91 n.14 (2d Cir. 2012). Those outlier decisions are thus "sapped of authority by *Heller*," and are not reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

no historical pedigree for restrictions, like New Jersey's, which prohibit *both* open and concealed carrying and thus "amount[ ] to a destruction of the right" altogether. *Reid*, 1 Ala. at 616.

*Drake* resisted this conclusion, reasoning that although these historical laws were upheld "because open carrying remained available as an avenue for public carrying," they nonetheless supported upholding New Jersey's restrictions on "carry[ing] openly *or* concealed" because they demonstrated a "longstanding tradition of regulating the public carrying of weapons for self- defense." 724 F.3d at 433. But that argument "is conducted at too high a level of generality": concluding from the limited restrictions on *concealed* carrying that were generally upheld by the courts—but not without generating "grave discussion" and "a great difference of opinion on the question of" their constitutionality, 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (O. Holmes ed., 12th ed. 1873)—that there was a tradition of restricting "the public carrying of weapons" generally is " 'akin to saying that because the government traditionally could  prohibit defamation, it can also prohibit speech criticizing government officials.' " *Drake*, 724 F.3d at 433, 451 (Hardiman, J., dissenting) (quoting *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1294 (D.C. Cir. 2011) (Kavanagh, J. dissenting)). On this rationale, all gun control is "presumptively lawful" (and

17

*Heller* was wrongly decided) because there is a "tradition" of regulating the use and possession of firearms for public safety. *Reductio ad absurdum*.

The *Drake* majority also thought New Jersey's law was itself sufficiently "longstanding," since "[t]he 'justifiable need' standard . . . has existed in New Jersey in some form for nearly 90 years." 724 F.3d at 432. That argument fails twice over. To begin, New Jersey imposed a "need" requirement on *all* public carrying for only *half* that time. As the Third Circuit recognized, until 1966 the State required a showing of "need" only for carrying *concealed* handguns while not restricting open carry—and its law was thus merely one example of the (irrelevant) concealed-carry restrictions just discussed. *Id.*

Second, even setting this point aside and starting the clock in 1924, an outlier law adopted by New Jersey and a handful of other States nearly a century and a half after the Founding—and even today adhered to by well under a quarter of the States—is hardly the type of longstanding, traditional limitation referenced in *Heller*. 554 U.S. at 627 n.26. Like other constitutional rights, the Second Amendment establishes minimum national standards that must be enforced against "resisting local outliers," Michael J. Klarman, *Rethinking the Civil Rights & Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996), and the national standards cannot be dictated *by the outliers*. That is particularly so where the local restriction has only been on the books for about a third of our American experiment and is not

18

grounded in historical restrictions of earlier vintage. "While two-hundred years from now, restrictions from [1924] may seem longstanding, looking back only to [1924], today, omits more than half of America's history and belies the purpose of the inquiry." *Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D. Tex. 2015), *rev'd on other grounds sub nom. Mance v. Sessions*, 880 F.3d 183 (5th Cir. 2018).

The court in *Wrenn* also rejected any notion that "'longstanding' practices" of regulating public carriage "so shrank the right" that "good-reason laws [were] beyond its reach." Instead, the court held that "even for those lacking special self-defense needs," "the individual right to carry common firearms beyond the home for self-defense . . . falls within the core of the Second Amendment's protections." 864 F.3d at 659, 661. And *Drake*, for its part, explicitly rejected the argument "that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone," as unsupported by "the Second Amendment jurisprudence of either the Supreme Court or this Court." 724 F.3d at 434. And as the persuasive analysis in *Wrenn* shows, *Drake* erred in concluding that New Jersey's ban was "outside the scope of the Second Amendment's guarantee." 724 F.3d at 434. *Drake* should be reversed.

19

### c.  The right to carry arms outside the home in self-defense is at the core of the Second Amendment.

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment, it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id*. at 599. And because the Second Amendment's text, history, and purposes all show that it extends outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond the home, too. *Id*. at 630. "Thus, the Amendment's core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

Again, *Drake* disagreed with this conclusion. While "[a]ssuming that the Second Amendment individual right to bear arms does apply beyond the home" for the sake of analysis, the Third Circuit held that "that right is not part of the core of the Amendment." 724 F.3d at 431, 436. But because *Drake* refused to engage in any meaningful "historical analysis" of whether the Second Amendment applies outside the home, it had *no basis* for concluding that the right to bear arms outside the home "is not part of the core of the Amendment." *Id*. at 431, 436. While the Third Circuit's decision to assume arguendo that the Second Amendment applies in public may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to leave the Third Circuit's conclusion that

the right to bear arms has diminished importance outside the home unmoored from any justification whatsoever. *Wrenn*, 864 F.3d at 663.

For the same reason, decisions from the First, Second, Fourth, and Ninth Circuits upholding laws similar to New Jersey's are to no avail. Each of those cases committed the same error as Drake: "simply assum[ing] for argument's sake that the [Second] Amendment covers some carrying," and then proceeding to "dispens[e] with the historical digging . . . essential to locating the Amendment's edge, or at least its core." *Wrenn*, 864 F.3d at 661–63. The repetition of this error by each of these courts does not somehow transform it into sound legal reasoning.

Had *Drake* fairly engaged in the textual and historical analysis required by *Heller*, it would have reached the same conclusion as the two circuits that *have* thoroughly considered the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them.

21

II.  **Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional.**

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements on the right's "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Defendants' prohibition on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. The Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id*. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id*. at 635 (majority opinion). And in *McDonald*, the

22

Court reaffirmed that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Defendants' demand that applicants show "a special danger to [their] life," N.J.A.C. 13:54-2.4(d)(1), beyond "[g]eneralized fears for personal safety," *In re Preis*, 573 A.2d at 152, *extinguishes* the core Second Amendment rights of *typical* citizens—who by definition cannot make such a showing. To be sure, Defendants' limits allow individuals to carry firearms if they can first "specify in detail [their] urgent necessity for self-protection." N.J.A.C. 13:54-2.4(d)(1). But the Second Amendment does not set up a race between law-abiding citizens and their accosters to the license bureau. For those whose safety is being threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "urgent necessity for self- protection" in advance*. The Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—does not allow that backwards scheme.

Indeed, demanding that a citizen proves to the Government's satisfaction that he has a good enough reason to carry a handgun flatly contradicts the nature of the Second Amendment right. The existence of the right is itself reason enough for its exercise. It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning

23

that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. *See, e.g., First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (government cannot condition speech on "a requirement that the speaker have a sufficiently great interest in the subject to justify communication"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prior restraint presumptively unconstitutional); *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (government cannot "question the centrality" or "plausibility" of religious convictions.

In short, a justifiable need requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666. It "destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . ., but by design: it looks precisely for needs 'distinguishable' from those of the community." *Id*. Such a prohibition is unconstitutional *per se*.

## III. *Drake* was wrong to uphold Defendants' "justifiable need" restriction under intermediate scrutiny.

### a. Strict scrutiny should apply.

Even if Defendants' restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny.

"[S]trict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text—it was considered "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Drake*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id*. at 780 (plurality).

### b. Defendants' "justifiable need" restriction fails even intermediate scrutiny, properly applied.

Ultimately, determining the correct standard of scrutiny is immaterial, however, because the "justifiable need" restriction should be struck down under any level of heightened scrutiny.

1.     That is so, first, as a matter of law. By design, Defendants' restrictions will reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary- effects area of free speech doctrine.

25

Government restrictions on certain types of expressive conduct (most commonly, zoning ordinances that apply adult entertainment establishments) are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only if the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id*. at 49. Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.* makes clear that in defending a restriction as sufficiently tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." 535 U.S. 425, 449 (2002). at 449 (Kennedy, J., concurring). "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id*. at 50; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Drake*, 724 F.3d at 455–56 (Hardiman, J., dissenting); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Defendants have done here. Their restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable

training and safety requirements. No, their purpose and effect is to *limit the number of arms borne in public*, and to the extent this leads to a reduction of gun crime, it is only a byproduct of this suppression of the quantity of core Second Amendment conduct. As state courts have explained, "the overriding philosophy of our Legislature is to limit the use of guns as much as possible." *State v. Valentine*, 124 N.J. Super. 425, 427 (App. Div. 1973). Or as the President of the New Jersey Senate recently stated, "This is New Jersey. It's not some State that thinks everyone should be carrying a gun . . . . [C]oncealed weapons don't belong in New Jersey." Steve Sweeney, President, New Jersey Senate, Remarks, N.J. Governor and Attorney General Announce Intention to Tighten Restrictions on Handgun-Carry Permits at 12:55 (Jan. 26, 2018), *available at* https://goo.gl/U4iTET.

As the D.C. Circuit concluded, limits like Defendants' "justifiable need" restriction "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.    Even if these objections are set aside, the heightened-need requirement flunks intermediate scrutiny, and *Drake* was wrong to uphold it. To survive intermediate scrutiny, the restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S.

515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id*. As the court in *Moore* concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," the data do not provide "more than merely a rational basis for believing that [an outright ban on public carriage] is justified by an increase in public safety." 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50. Yet "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment, in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists in favor of gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After Heller*, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that

28

is the proposition Defendants must support. For instance, in 2004 the National Academy of Sciences' National Research Council conducted an exhaustive review of the relevant social-scientific literature. It concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ. *See also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED.  40, 53–54 (2005), http://goo.gl/zOpJFL (CDC study concluding that existing evidence does not establish that more permissive carry regimes "increases rates of unintended and intended injury").

*Drake*'s cursory discussion of whether New Jersey's "justifiable need" requirement actually advances its public-safety justification fell far short of the court's duty "to assure that, in formulating its judgments, [New Jersey] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994). The only "evidence" the court considered in purportedly conducting intermediate scrutiny was: (1) a "staff report" evaluating "the utility of firearms as weapons of defense against crime" that was published *in 1968*, and (2) the fact that "[l]egislators in other states, including New York and Maryland, have reached this same predictive judgment and have enacted similar

29

laws as a means to improve public safety." *Drake*, 724 F.3d at 438. But a law that "imposes current burdens . . . must be justified by current needs," *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013), and a single study from fifty years ago is not "substantial evidence" that New Jersey's restriction, in light of the *current* empirical evidence, materially advances public safety. Nor does the bare fact that a handful of other jurisdictions have enacted similar restrictions suffice, without at least some analysis of whether *those* laws are effective in preventing violent crime or are themselves supported by substantial evidence. After all, the vast majority of States *do not* restrict their citizens' right to carry in this way.

The lack of evidence that these laws advance public safety should not be surprising; violent criminals will carry guns in public regardless. "Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016).

Instead of criminals, it is the *law-abiding* who are affected by Defendants' restrictions. That effect has very real public-safety *costs*—costs that Defendants ignore. Although the number of defensive gun uses is difficult to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance*

30

*to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "justifiable need" requirement cannot be shown to benefit the public safety—but it may well harm it.

3.     Even if Defendants' "justifiable need" restriction did advance public safety, it is not properly tailored to that purpose. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must possess "a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quotation marks omitted). Here, there is an utter lack of fit between Defendants' restrictions and their purported objective of public safety. After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This

31

limitation will neither make it less likely that those who meet the [justifiable need] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake*, 724 F.3d at 454 (Hardiman, J., dissenting).

## IV.   Because the Court is Compelled to Dismiss the Amended Complaint in its Entirety Under *Drake*, the Court Should Dismiss Defendants' Arguments that Would Result in Partial Dismissal as Moot.

Even if Defendants' judicial-immunity and failure-to-exhaust-administrative-remedies arguments has merit, they would only result in partial dismissal. But "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. . . . This procedure . . . streamlines litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-327 (1989). And, as argued above, this Court is bound to dismiss the Amended Complaint in its entirety under *Drake*. Judge Martinotti did so in a very similar case in 2018. *Rogers v. Grewal*, 2018 WL 2298359, at *4 (D.N.J. 2018).

Indeed, courts regularly dismiss claims in their entirety without entertaining arguments that would result in partial dismissal. *RD Legal Funding, LLC v. Barry A. Cohen, P.A*., No. CIV.A. 13-77 JLL, 2013 WL 1338309, at *3 (D.N.J. Apr. 1, 2013) ("Because the Court dismisses Plaintiff's Complaint, in its entirety, … the Court declines to address the alternative arguments raised by Defendants in support of their motion to dismiss."); *Benning v. Browner*, No. CIV. A. 97-CV-7058, 1998 WL

717436, at *1 (E.D. Pa. Sept. 24, 1998). Therefore, this Court should follow binding circuit precedent, dismiss the Amended Complaint in its entirety, and dismiss Defendants' motions as moot for the sake of judicial economy.

## V.    Defendants Tarantino, Rea, and Conforti are not entitled to judicial immunity.

The State is wrong to contend that Defendants Tarantino, Rea, and Conforti—the New Jersey judges who either denied the Handgun Carry Permit application of Plaintiff Mazahreh (Tarantino), or who would be responsible for issuing permits to Plaintiffs De Almeida (Rea) and Swenson (Conforti)—are protected from this lawsuit by "absolute judicial immunity." Br. in Supp of State Defs' Mot. to Dismiss at 5 (Mar. 22, 2021), Doc. 25-1 ("State MTD Brief"). While state judicial officers are immune from injunctive relief based on acts taken in their "judicial capacity," 42 U.S.C. § 1983,[3] Defendants concede that judicial immunity does not extend to "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." *Id.* (quoting *Mireles v. Waco*, 502 U.S. 9, 12 (1991)). And New Jersey law makes clear

---

[3] Defendants rely on the judicial immunity "established at common law," State MTD Brief 5, but *Pulliam v. Allen* makes clear, the common-law immunity discussed in the cases Defendants cite does not bar "prospective injunctive relief against a judicial officer acting in her judicial capacity," 466 U.S. 522, 541–42 (1984); see also State MTD Brief 6 (citing cases that all involve "liability for damages"). Following the Supreme Court's decision in *Pulliam*, Congress amended Section 1983 to partially restore judicial officers' immunity from injunctive relief. *See* 42 U.S.C. § 1983; *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197–98 (3rd Cir. 2000). Any immunity Defendants Tarantino, Rea, and Conforti may enjoy thus arises from this amendment to Section 1983, not the common law.

beyond any doubt that the state judge's role in administering the handgun permitting regime is quintessentially nonjudicial.

The New Jersey Supreme Court held that "[t]he legislative designation of the judiciary as the issuing authority . . . burdened the Justices with functions which were *clearly nonjudicial* in nature; indeed the Justices might well have declined the designation as unduly interfering with the proper discharge of their judicial responsibilities." *Siccardi v. State*, 59 N.J. 545, 553 (1971) (emphasis added). The Court reiterated that in providing for "a Superior Court judge to issue [each Handgun Carry] permit . . . the Legislature has reposed what is essentially an *executive function* in the judicial branch.' " *In re Pries*, 573 A.2d at 151 (emphasis added) (quoting *Siccardi*, 59 N.J. at 553). The relief Plaintiffs seek against Defendants Tarantino, Rea, and Conforti in this action would thus affect the very paradigm of those "administrative . . . or executive functions that judges may on occasion be assigned by law to perform" that are *not* "entitled to immunity." *Forrester v. White*, 484 U.S. 219, 227 (1988).

Finally, even if Defendants Tarantino, Rea, and Conforti were immune from suit, Defendants do not dispute that no immunity protects the remaining defendants: Attorney General Grewal, Superintendent Callahan, Chief Meder, Chief Bryan, and Chief Brennan. Their presence as parties is sufficient to allow the case to go forward, and Defendants do not suggest otherwise.

34

**VI.    Plaintiff De Almeida was not Required to Exhaust Administrative Remedies Because Applying for A Permit Would Have been Futile.**

Chief Bryan incorrectly states that a plaintiff must pursue all administrative remedies available before they seek judicial review. Chief Bryan's Br. in Supp. of Mot. to Dismiss 7, Apr. 19, 2021, Doc. No. 26-1 ("Bryan MTD Brief"). Mr. De Almeida's effort to acquire a permit through an application would be a fruitless endeavor, with negative ramifications for his employment. Am. Compl. ¶ 48, Mar. 8, 2021, Doc. No. 23. He was not required to apply for a permit because the exhaustion-of-remedies doctrine does not apply when "the legal question is 'fit' for resolution and delay means hardship . . . or when exhaustion would prove 'futile.'" *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000); *See also Houghton v. Shafer*, 392 U.S. 639, 640-41 (1968) ("[T]o require petitioner to appeal . . . would be to demand a futile act."). That is the case here.

The Third Circuit has distinguished between "prudential exhaustion" and "judicial exhaustion." *Wilson*, 475 F.3d at 174. "When exhaustion is required by statute, its application is not subject to judicial discretion. This 'judicial exhaustion' is a prerequisite to a court's subject matter jurisdiction." *Hum. Genome Scis., Inc. v. Genentech, Inc.*, 589 F. Supp. 2d 512, 519 (D. Del. 2008). On the other hand, prudential exhaustion is "not a prerequisite to the district court's jurisdiction. 'A prudential exhaustion requirement is generally judicially created, aimed at respecting

agency autonomy by allowing it to correct its own errors.'" *Id*. (quoting *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997)).

It is unclear what type of exhaustion argument Chief Bryan is making. Chief Bryan only moved to dismiss for failure to state a claim under Rule 12(b)(6). Mot. to Dismiss 2. ECF No. 26, which is the appropriate way to pursue a prudential exhaustion defense. *Hum. Genome Scis., Inc.*, 589 F. Supp. 2d at 519 n.10. But Chief Bryan also raises ripeness and advisory-opinion arguments. Bryan MTD Brief at 9. These are jurisdictional arguments and should therefore have been brought under a Rule 12(b)(1) motion. *Id*. at 519 n.9. Plaintiffs will respond to both arguments.

Courts generally look to the statute to determine if there is a jurisdictional exhaustion requirement. *Batchelor v. Rose Tree Media Sch. Dist*., 759 F.3d 266, 272 (3d Cir. 2014) (citation omitted); *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 279 (3d Cir. 2007) ("But as important as the rule may be, '[the statute] nowhere mentions the exhaustion doctrine.'") (internal quotations omitted). Section 1983 has no exhaustion requirement. The Supreme Court has long allowed section 1983 claims to proceed when exhausting administrative remedies would be futile. *Houghton*, 392 U.S. at 640. N.J.S. 2C:58-4 does not have an exhaustion requirement either. Therefore, any failure to exhaust did not deprive the Court of jurisdiction to hear the case.

Chief Bryan also misunderstands the claim and his advisory-opinion argument is misplaced. Bryan MTD Brief at 9. The claim is not that any of the Plaintiffs are

entitled to a permit under the statute. The claim is that the "justifiable need" requirement is unconstitutional because it deprives the "people" of their right to bear arms. *Heller*, 554 U.S. at 580 (The people "unambiguously refers to all members of the political community, not an unspecified subset."); *id*. at 581 (The "people" means "all Americans."). Mr. De Almeida can be granted relief by declaring that the "justifiable need" requirement violates the Second Amendment, which would allow him to apply for a permit without having to show a "justifiable need."

If there is any exhaustion requirement here, it is prudential and subject to the futility exception. "In order to invoke the futility exception to exhaustion a party must 'provide a clear and positive showing' of futility before the District Court." *Wilson*, 475 F.3d at 175 (quoting *D'Amico v. CBS Corp.*, 297 F.3d 287, 293 (3d Cir. 2002). Mr. De Almeida admits that he is unable to meet the "justifiable need" requirement. Almeida Decl. ¶ 6. Chief Bryan agrees: "[Mr.] De Almeida has not plead sufficient facts to show a 'justifiable need' to carry a handgun." Bryan MTD Brief at 13. *See also id*. at 14 (collecting authorities and concluding that Mr. De Almeida does not meet the justifiable need standard). All the parties agree that he was certain to be denied. There is no need to make him "'go through obviously useless motions in order to preserve [his] rights.'" *Genentech*, 589 F. Supp. 2d at 519 (internal citation omitted); *see also U.S. ex rel. Marrero v. Warden, Lewisburg Penitentiary*, 438 F.2d 656, 659 (3d Cir. 1973), *rev'd on other grounds by Warden, Lewisburg Penitentiary*

*v. Marrero*, 417 U.S. 653, (1974) ("We are especially reluctant to require exhaustion when, as here, both parties agree administrative proceedings would be futile.")

Moreover, Mr. De Almeida is a longshoreman and must undergo background checks, which include a question as to whether he has ever been denied a firearms license. Am. Compl. ¶ 48, Mar. 8, 2021, Doc. No. 23. Requiring him to apply for a permit would only cause him to suffer unnecessary "hardship," by needlessly dragging the arbitrariness of New Jersey carry permit law into his longshoreman credentialing. *Shalala*, 529 U.S. at 13. Mr. De Almeida has therefore provided "a clear and positive showing" of futility. *Wilson*, 475 F.3d at 175.

Finally, "exhaustion of administrative remedies serves to 'promote administrative efficiency, "respect executive autonomy," provide courts with the benefit of an agency's expertise, and serve judicial economy . . . .'" *Wilson,* 475 F.3d at 173 (citation omitted). None of those purposes would be served by agency review here. Mr. De Almeida does not meet the statutory "justifiable need" standard. Nothing can change that. And this lawsuit facially challenges the "justifiable need" standard. Exhaustion is not required when there is a "clear and unambiguous violation of . . . constitutional rights." *Susquehanna Valley All. v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 245 (3d Cir. 1980).

38

## VII.   The Amended Complaint States a Claim against Defendant Bryan.

Finally, Defendant Chief Bryan is wrong that the Amended Complaint fails to state a claim against him on the ground that it does not allege facts but only conclusions of law. Bryan MTD Brief at 10.

First, Defendant Bryan misunderstands the nature of this action.  Because this is a challenge to the requirement that an applicant for a Handgun Carry Permit show justifiable need, in order to have standing to do so, a Plaintiff challenging the requirement must allege that he suffers an injury by the enforcement of the requirement. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).  In the case of Mr. De Almeida and the other Plaintiffs, they allege, as they must, that they do *not* have justifiable need.   Lacking justifiable need, the Plaintiffs cannot obtain a Handgun Carry Permit and therefore cannot exercise their Second Amendment right to keep and bear arms in public.  From this flows their injury, and thus their standing. Claiming that the Amended Complaint fails to state a claim because it fails to allege that Mr. De Almeida *does* have justifiable need is nonsensical.

Chief Bryan is also mistaken that the Amended Complaint alleges no facts but only conclusions of law. The key facts as pleaded are that Mr. De Almeida:

(1) has no disqualifying attributes (Am. Compl. ¶ 44, Mar. 8, 2021, Doc. No. 23)

(2) has the required training (*Id.*);

(3) can supply the required three references (*Id.*);

(4) desires to carry a handgun in public for self-defense (*Id.* at ¶ 45);

(5) cannot show justifiable need and therefore cannot obtain a permit (*Id.* ¶ 46); and

(6) thus refrains from carrying a handgun in public for fear of arrest (*Id.* at ¶ 45, 49).

These facts plainly satisfy the pleading requirements, and Chief Bryan's motion should be denied.

## CONCLUSION

For the reasons set forth above, the Court should grant Summary Judgment dismissing the Amended Complaint, as this Court is bound by *Drake*, and *Drake* should be overruled by a court competent to do so.

The Court should also either (1) deny the motions to dismiss with prejudice, or in the alternative, (2) deny them without prejudice as moot given the Court's obligation to dismiss the Amended Complaint in its entirety on its merits.

Dated:  April 19, 2021                    Respectfully submitted,

<div style="margin-left: 40%">

s/ Daniel L. Schmutter
Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Plaintiffs*

</div>